IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

PORTLAND DIVISION

CRAIG N. W.  REYNOLDS,

               Plaintiff,

v.

MICHAEL J. ASTRUE, Commissioner, Social
Security Administration,

               Defendant.

CV-10-71-ST

OPINION AND ORDER

STEWART, Magistrate Judge:

## INTRODUCTION

Plaintiff, Craig N. W. Reynolds ("Reynolds"), seeks judicial review of the final decision

by the Social Security Commissioner ("Commissioner") denying his application for Disability

Insurance Benefits ("DIB") under Title II of the Social Security Act ("SSA"), 42 USC §§ 401-33.

This court has jurisdiction to review the Commissioner's decision pursuant to 42 USC § 405(g).

All parties have consented to allow a Magistrate Judge to enter final orders and judgment in this

case in accordance with FRCP 73 and 28 USC § 636(c).  For the reasons set forth below, the Commissioner's decision is reversed and this case is remanded for the calculation and payment of benefits.

## ADMINISTRATIVE HISTORY

Reynolds applied for DIB on March 17, 2003, alleging a disability onset date of May 1, 1990.[1]  Tr. 53-58.[2]  His date last insured ("DLI") was March 31, 1998.  Tr. 61, 387, 440.  Therefore, to recover DIB, Reynolds must establish that he suffered from a disability prior to March 31, 1998.

After his application was denied both initially and on reconsideration (Tr. 28-32, 34-36), Reynolds requested a hearing before an Administrative Law Judge ("ALJ").  On December 6, 2005, ALJ Dan R. Hyatt presided over a hearing at which Reynolds, one of his younger brothers, Allen Reynolds, and a vocational expert ("VE"), Rosalyn Kliot, appeared and testified.  Tr. 346-70.  ALJ Hyatt issued a decision denying benefits on December 23, 2005.  Tr. 397-406.

On May 5, 2006, the Appeals Council denied Reynolds' request for review, making ALJ Hyatt's decision the Commissioner's final decision.  Tr. 5-8.  Reynolds filed a request for judicial review with this court.  *Reynolds v. Astrue*, Case No. 06-CV-827-MA.  On June 25, 2007, based on the stipulation of the parties, this court remanded this case for further administrative proceedings.  Tr. 415-16.

///

---

[1]  Regardless of the onset date, Reynolds is not eligible for DIB for any month preceding March 2002, 12 months before his application.  20 CFR § 404.621.

[2]  Citations are to the page(s) indicated in the official transcript of record filed on July 28, 2010 (docket #9).

On December 14, 2007, ALJ Linda Haack presided over a second hearing at which Reynolds and his brother again testified, as did an independent medical expert ("IME"), David Rullman, M.D., and a second VE, Kay Wise. Tr. 450-98. ALJ Haack issued an unfavorable decision on April 24, 2008, finding Reynolds not disabled at any time from May 1, 1990, the alleged onset date, through March 31, 1998, the DIL. Tr. 384-96. The Appeals Council declined to assume jurisdiction over Reynolds' request for review. Tr. 371-73. Thus, ALJ Haack's April 24, 2008 decision is a final decision of the Commissioner. 20 CFR § 404.984(a).

## <u>BACKGROUND</u>

Reynolds was born in 1953. Tr. 22. He completed high school, earned a bachelor's degree in architecture in 1976, and has past relevant work as an architect. Tr. 65, 70-71.

Reynolds alleges that he became unable to work on May 1, 1990, due to the debilitating effects of multiple sclerosis ("MS"). Tr. 53, 187. When his father died in 1989, Reynolds was living in southern California and working for an architecture firm in Long Beach. Tr. 59, 71. Shortly thereafter, his mother, Barbara Reynolds, was diagnosed with cancer. Reynolds moved back to Oregon in 1990 and "provided the muscle" in the household. Tr. 351.

Reynolds last earned gainful wages in 1990, but continued to perform some architectural work through 1997. Tr. 58, 95. He worked on one project per year for a couple of months during 1990, 1992, 1994, 1995, and 1997. Those projects involved intermittently preparing some "pretty simple drawings" for the company one of his brothers worked for, but Reynolds discontinued that work entirely in 1997. Tr. 62, 64, 76, 80, 355, 488-89.

///

///

**DISABILITY ANALYSIS**

In construing an initial disability determination, the Commissioner engages in a sequential process encompassing between one and five steps.  20 CFR § 404.1520; *Bowen v. Yuckert*, 482 US 137, 140 (1987).

At step one, the ALJ determines if the claimant is performing substantial gainful activity.  If so, the claimant is not disabled.  20 CFR § 404.1520(a)(4)(i).

At step two, the ALJ determines if the claimant has "a severe medically determinable physical or mental impairment" that meets the 12-month durational requirement.  20 CFR § 404.1520(a)(4)(ii).  Absent a severe impairment, the claimant is not disabled.  *Id.*

At step three, the ALJ determines whether the severe impairment meets or equals an impairment "listed" in the regulations.  20 CFR § 404.1520(a)(4)(iii); 20 CFR Pt. 404, Subpt. P, App. 1 (Listing of Impairments).  If the impairment is determined to meet or equal a listed impairment, then the claimant is disabled.

If adjudication proceeds beyond step three, the ALJ must first evaluate medical and other relevant evidence in assessing the claimant's residual functional capacity ("RFC").  The claimant's RFC is an assessment of work-related activities the claimant may still perform on a regular and continuing basis, despite the limitations imposed by his or her impairments.  20 CFR § 404.1520(e); Social Security Ruling ("SSR") 96-8p, 1996 WL 374184 (July 2, 1996).

At step four, the ALJ uses the RFC to determine if the claimant can perform past relevant work.  If the claimant cannot perform past relevant work, then at step five, the ALJ must determine if the claimant can perform other work in the national economy.  *Yuckert*, 482 US at 142; *Tackett v. Apfel*, 180 F3d 1094, 1099 (9th Cir 1999); 20 CFR § 404.1520(a)(4)(v).

The initial burden of establishing disability rests upon the claimant. *Tackett*, 180 F3d at 1098. If the process reaches step five, the burden shifts to the Commissioner to show that jobs exist in the national economy within the claimant's RFC. *Id.* If the Commissioner meets this burden, then the claimant is not disabled. 20 CFR § 404.1566.

## ALJ'S FINDINGS

At step one, the ALJ concluded that Reynolds did not engage in any substantial gainful activity between the alleged onset date of his disability on May 1, 1990, and his DIL of March 31, 1998. Tr. 389. At step two, the ALJ determined that Reynolds suffers from the severe impairments of MS and hepatitis. *Id.*

At step three, the ALJ concluded that Reynolds did not have an impairment or combination of impairments that meets or equals any of the listed impairments. *Id.* The ALJ decided that Reynolds had the RFC to: (1) sit 8 hours out of an 8 hour day, two hours at a time, with normal breaks; (2) stand 2 hours out of an 8 hour day, 30 minutes at a time; (3) walk one mile; and (4) lift 10 pounds frequently and 20 pounds occasionally. Tr. 390. The ALJ also found Reynolds limited to only occasional postural activities and routine, repetitive work, and needed to avoid: (1) climbing stairs, ladders, scaffolds, ramps and ropes; (2) exposure to unprotected heights, vibration, hazards, dangerous machinery, and extreme heat and cold; and (3) work with the general public, jobs requiring teamwork to complete projects, and jobs requiring close supervision. *Id.*

At step four, the ALJ found that Reynolds was unable to perform any of his past relevant work and the full range of light work. Tr. 395. However, based on the VE's testimony, the ALJ concluded that Reynolds could perform other work that exists in significant numbers in the

national economy as a packing checker (DOT 222.687.030, unskilled, light duty, SVP 2), price

marker (DOT 209.587.034, unskilled, light duty, SVP 2), table worker (DOT 706.684.042,

unskilled, sedentary, SVP 2), assembler (DOT 734.687.018, unskilled, sedentary, SVP2), and

optical goods worker DOT 731.684.038, unskilled, sedentary, SVP 2).  Tr. 395-96, 493-94.

Accordingly, the ALJ concluded that Reynolds was not disabled prior to March 31, 2008, and

therefore was not entitled to DIB.

## STANDARD OF REVIEW

The reviewing court must affirm the Commissioner's decision if the Commissioner

applied proper legal standards and the findings are supported by substantial evidence in the

record.  42 USC § 405(g); *Batson v. Comm'r of Soc. Sec. Admin.*, 359 F3d 1190, 1193 (9th Cir

2004).  This court must weigh the evidence that supports and detracts from the ALJ's conclusion.

 *Lingenfelter v. Astrue*, 504 F3d 1028, 1035 (9th Cir 2007), citing *Reddick v. Chater*, 157 F3d

715, 720 (9th Cir 1998).  The reviewing court may not substitute its judgment for that of the

Commissioner.  *Id*, citing *Robbins v. Soc. Sec. Admin.*, 466 F3d 880, 882 (9th Cir 2006); *see also*

*Edlund v. Massanari*, 253 F3d 1152, 1156 (9th Cir 2001).  Variable interpretations of the

evidence are insignificant if the Commissioner's interpretation is a rational reading.

*Lingenfelter*, 504 F3d at 1035; *Batson*, 359 F3d at 1193.

## DISCUSSION

## I.  Context of the Disputed Evidence

No medical records support the conclusion that Reynolds was suffering from the

symptoms of MS in 1990.  The earliest medical charts in the record date from early July 1994,

when Reynolds – after two decades of not seeing a doctor – sought medical care for an arm that

"suddenly felt heavy" and four days of left side weakness.  Tr. 221-22.  At that time, he reported

"subtle" left upper extremity changes and decreased dexterity.  *Id*.  He also reported intermittent

"slurred speech" and "chronic fatigue" for the preceding two years.  *Id*.  His mother accompanied

Reynolds to the medical appointment and reported speech changes in which Reynolds became

"tongue tied" and "stumbles on words."  *Id*.  The examining doctor's assessment was "?? MS

Presentation" (Tr. 220) and apparently ordered a lumbar puncture which took place on July 19,

1994.  Tr. 220, 223-24.

The ALJ acknowledged that Reynolds' "[t]reatment records reflect some symptoms

resulting in work-related limitations prior to [his] date last insured."  Tr. 390.  Reynolds' treating

neurologist, Gregory L. Clark, M.D., opined that Reynolds was "already disabled" as of

December 14, 2000, due to cognitive limitations.  Tr. 142.  This opinion is shared by the IME,

Dr. Rullman, who testified at the December 14, 2007 hearing, that there was no "question at all

that Mr. Reynolds [was] dysfunctional from [MS]" by December 14, 2000.  Tr. 472; *see also*

Tr. 354.  The issue in this case is whether that acknowledged disability existed 17 months earlier

when Reynolds' insured status expired on March 31, 1998.

Reynolds asserts that he was incapable of gainful employment on or before March 31,

1998, as a result of three primary symptoms caused by his MS, namely dementia, fatigue, and

irritability.  He asserts that the Commissioner improperly failed to account for evidence of those

symptoms in the record prior to his DIL.  As discussed below, the evidence on which Reynolds

relies comes primarily from two sources, namely the testimony of his brother and chart notes of a

nurse in Dr. Clark's office.

Reynolds' symptomatic picture is somewhat complicated by the convergence of several factors. First, Reynolds' MS resulted in primarily cognitive, rather than physical, limitations. The record supports the IME's opinion that Reynolds remained "physically quite functional" well after his DIL and that his MS was a "bit unusual in the sense that it seems to primarily affect his cognitive ability." Tr. 456-57.

Second, for several years after he began experiencing MS-related symptoms and several years prior to his DIL, Reynolds lived with his mother who provided a full range of support for him. Tr. 48, 299. That living situation appears to have been initially prompted by Mrs. Reynolds' need for assistance getting to and from her own chemotherapy appointments. However, it is clear that Mrs. Reynolds later assumed caretaking functions for Reynolds. At some juncture, Reynolds became "near-completely dependent upon the care of his mother and [later] of his brothers." Tr. 299; *see also* Tr. 89-91,

Third, Reynolds repeatedly attempted to continue to function in his chosen occupation, visited his treating neurologist only annually, and went to great lengths to keep the details concerning his disability under wraps. Reynolds apparently kept an active license to practice architecture even after ceasing architectural work. However, in 2001, the Board of Architect Examiners refused to allow Reynolds a hardship exemption from the continuing education requirements based solely on the statement that he has MS. Tr. 137-38. He balked at providing additional information, explaining that if he wanted other people to know about his condition, he would have told them himself. Tr. 137. This "unwillingness or inability on [Reynolds'] part . . . to disclose personal information" was also reflected in later neuropsychological testing. Tr. 321.

The net result of the convergence of these factors is a relatively sparse record concerning the functional limitations imposed on Reynolds as the result of MS prior to March 31, 1998. However, the available evidence, when properly credited and considered in light of later neuropsychological testing and VE testimony, unequivocally points to the conclusion that Reynolds was disabled prior to the expiration of his insured status on March 31, 1998.

**II.  Chart Notes and Testimony of Allen Reynolds**

The medical records contain references to Reynolds' dementia ("memory problems"), fatigue, and irritability.  These symptoms also are supported by the testimony of Allen Reynolds. Those records and testimony are critical to evaluating the significance of later neuropsychological evaluations performed in 2004 and 2005 and the VE testimony at the administrative hearings.  As explained below, the ALJ did not properly account for that evidence in determining Reynolds' RFC.

**A.  Evidence**

**1.  March 27, 1998 Chart Notes**

The chart notes at issue were written by Judy Johnson, a nurse who worked with Reynolds' treating neurologist, Dr. Clark.  During the course of an annual examination on March 27, 1998, a few days before the DIL,  Nurse Johnson noted the following symptoms: (1) "Fatigue: Does not feel refreshed by nights sleep.  Fatigue sets in by noon.  Takes nap.  Limits ADL's due to no energy, no ambition;" (2) "Depression: . . . More irritable/angry lately.  Stopped working because of feeling down about life.  Difficulty with concentration;" (3) "Cognitive: Sluggish memory."  Tr. 162-63.

///

### 2. **Allen Reynolds' Testimony**

Reynolds' primary contact and caretaker in the mid-1990s was his mother who passed away over two years before the first administrative hearing. Tr. 41. Reynolds' extended relatives all live in England, and he never married and has no children. Tr. 293. Additionally, Reynolds' father apparently also suffered from MS. Reynolds' two brothers, who watched their father's condition deteriorate over the years, were reluctant to discuss and deal with Reynolds' condition. Tr. 142. With their mother gone and Reynolds suffering from MS-related dementia, the most significant evidence concerning the functional limitations imposed by Reynolds' symptoms came from his brother, Allen Reynolds, who testified at both administrative hearings.

According to Allen Reynolds, by 1996 or 1997 Reynolds had started napping "constantly" during the day, and his day basically consisted of "getting up in the morning, reading the paper, puttering around for an hour or two and then having lunch and taking a nap." Tr. 356-58. Reynolds sat for the vast majority of the three or four hours of Allen Reynolds' visits, while Allen Reynolds or his son would mow the yard and perform odd jobs around the house. Tr. 362-63.

### B. **Legal Standards**

Although closely involved in Reynolds' medical encounters, Nurse Johnson is not considered an "acceptable medical source," but instead is considered an "other source" under the relevant regulations. 20 CFR § 404.1513(d)(1); *see also* SSR 06-03p, 2006 WL 2329939 (August 9, 2006). In order to disregard testimony from an "other source," including testimony by nurse practitioners involved in the claimant's treatment, 20 CFR § 404.1530(d)(1), and family members who are involved in the claimant's care or who have an opportunity to observe a

claimant's functional abilities and restrictions, 20 CFR 404.1513(d)(4), the ALJ must provide reasons that are both "germane" and "specific." *Turner v. Comm'r of Social Sec.*, 613 F3d 1217, 1223-24 (9th Cir 2010); *Bruce v. Astrue*, 557 F3d 1113, 1115 (9th Cir 2009).

When an ALJ rejects the testimony of a lay witness, the ALJ must give reasons that are germane to the witness. *Nguyen v. Chater*, 100 F3d 1462, 1467 (9th Cir 1996); *see also Regennitter v. Comm'r*, 166 F3d 1294, 1298 (9th Cir 1999).

### C.  Analysis

The Commissioner contends that the ALJ adequately rejected Nurse Johnson's March 27, 1998 chart note.  In particular, the Commissioner points out that Reynolds completed a screening inventory that indicated that he was asymptomatic for signs of depression and that Nurse Johnson sent him information concerning memory loss in individuals over age 40 and did not refer him on for further evaluation.  Several difficulties are inherent in this line of reasoning.

First, it provides no reason at all to reject the chart note to the extent it discusses Reynolds' problems with fatigue.  Second, as noted by Dr. Rullman, little or no conclusion can be drawn from the observation that "individuals in their 40's wonder about their memory at times."  Tr. 460.  Finally, it fails to account for the undisputed evidence that Reynolds was, at that time, in a living situation that largely insulated him from outside stressors.  The Commissioner is required to consider a claimant's ability to function outside of highly structured or supportive settings which tend to control or attenuate a claimant's symptoms, including structured and supportive home environments.  20 CFR Pt. 404, Subpt. P, App. 1 § 12.00(F).  It is undisputed that Reynolds was dependent on his mother for support, including emotional and financial support.  Mrs. Reynolds prepared meals and did the housework (Tr. 90), handled the

household money (Tr. 91), did the household shopping (*id*), helped Reynolds take his medications and injections (Tr. 89), and intervened when Reynolds would experience fits of irritation or agitation (Tr. 365). Despite that support, his brother testified to a significant impairment in Reynolds' ability to cope with the minimal stressors placed on him as early as 1996 and 1997. The ALJ did not properly reject that testimony which provides the context for the chart notes entered by Nurse Johnson.

The ALJ found Allen Reynolds' testimony to be of "little assistance" in assessing Reynolds' functioning on and prior to his DIL due to "minimal contact" between the brothers during that time period. Tr. 394. However, Allen Reynolds testified that during 1996 and 1997, he visited Reynolds and their mother on weekends and holidays and stayed in constant contact by telephone, talking with their mother three or four times a week. Tr. 355, 358. This testimony is unrefuted and directly contradicts the ALJ's conclusion concerning Allen Reynolds' ability to observe Reynolds' functioning during the relevant time period. Accordingly, the ALJ's observation that Allen Reynolds had only "minimal contact" with Reynolds during the relevant time period is not supported by substantial evidence in the record. Because this is the only reason given by the ALJ for discrediting Allen Reynolds' testimony, it was error to reject that testimony concerning Reynolds' functional limitations.

## III.  Fatigue

The ALJ recognized that Reynolds "may have napped during the day," but asserted that the "evidence does not suggest this was a medical necessity." Tr. 392. Despite that  misgiving, the ALJ purported to give the reports of fatigue "some credence" in assessing Reynolds' RFC by including a limitation that Reynolds could perform only "sedentary to light work with a sit/stand

option." Tr. 392, 394.  The conclusion both ignores evidence that Reynolds' fatigue is a

symptom associated with his MS diagnosis and fails to incorporate the limitations actually

supported by the testimony.

References to chronic fatigue appear in the medical records as early as 1994 and continue

through Reynolds' last appointment prior to his DIL of March 31, 1998.  Reynolds reported

fatigue during his earliest appointment with his neurologist, Dr. Clark, on July 12, 1994, when

Reynolds reported suffering from chronic fatigue for about two years.  Tr. 199-200.  His fatigue

was in fact one of the reasons Dr. Clark suspected that Reynolds suffered from MS:

> Patient presents with episode of slurred speech lasting two months
> ago under stress, with recurrence under stress, and very subtle
> acute onset of left side dysfunction.  He has essentially [normal]
> neurological examination.  The symptoms, *in conjunction with
> fatigue*, would make the examiner possibly suspicious for MS,
> although by the patient's own account the symptoms are quite
> subtle.

Tr. 200 (emphasis added).

Later medical chart notes also mention fatigue.  Tr. 196 (9/25/1995 "some fatigue"); 193

(3/7/96 "worsening of fatigue").  Dr. Clark clearly related Reynolds' fatigue with his MS

diagnosis, in direct contradiction to the ALJ's unsupported conclusion that Reynolds' naps were

not a medical necessity.  Thus, the ALJ erred by summarily concluding that Reynolds' napping

was not a medical necessity.

Nurse Johnson's notes indicate that Reynolds' fatigue was "chronic" and "sets in by

noon."  Tr. 162.  Similarly, Allen Reynolds testified that by 1997 Reynolds was napping

"constantly" and spent only a few hours "puttering around" after waking up in the morning,

eating lunch, and then taking a nap.  Tr. 358.  Nurse Johnson's notes referencing fatigue that

"sets in by noon" is entirely consistent with Allen Reynolds' testimony. Despite that evidence, the ALJ included no limitation in Reynolds' RFC that encompasses constant napping after lunch. Instead, the RFC crafted by the ALJ envisions a worker who is able to: (1) sit 8 hours in an 8 hour day, two hours at a time with "normal" breaks; and (2) stand 2 hours out of an 8 hour day, 30 minutes at a time. Allen Reynolds' description of his brother's daily life in 1997 is in stark contrast to that RFC. Constant napping after lunch due to fatigue can hardly be described as a "normal" break in the context of competitive employment. To the contrary, the VE testified unequivocally that Reynolds would be unemployable if he required naps such as those described by his brother. Tr. 495.

## IV.  **Dementia & Irritability**

Although the evidence of fatigue and associated napping is dispositive, Reynolds' other symptoms of MS-related dementia and irritability merit some discussion. Both Nurse Johnson's chart note and Allen Reynolds' testimony reference these symptoms. Nurse Johnson noted that Reynolds was more "irritable" and "angry" and was experiencing a "sluggish" memory. Tr. 162-63. These notes are consistent with contemporaneous observations by Allen Reynolds and later neuropsychological testing.

### 1.  **Irritability/Anger**

Allen Reynolds is eight years younger than Reynolds. Tr. 484-85. In April 2003, he completed a form describing Reynolds as a "very patient person" when they were growing up, "always [being] the person [he] could count on with help concerning schoolwork, and later on with complicated household projects." Tr. 110. However, by 1996 or 1997 Reynolds began showing uncharacteristic disinterest in family gatherings and starting to isolate. Tr. 365-66.

Consistent with Nurse Johnson's March 27, 1998 chart notes, Allen Reynolds testified that by 1996 or 1997 his brother had become "irritable, agitated, and more or less kind of belligerent concerning things." Tr. 358. He would become very agitated when "simple tasks" did not go as planned. Tr. 364. Minor problems such as not being able to find a household item in the garage would cause Reynolds to "start flinging things around." Tr. 365. Their mother "very often" had to intervene to pacify Reynolds and mediate the situation. *Id*.

The ALJ incorporated a restriction that Reynolds was unable to perform jobs requiring him to work with the general public, engage in teamwork, or work under close supervision. Nevertheless, the VE testified that unpredictable "overt expression" of feelings of frustration and anger would render it "unlikely" that an individual could sustain competitive employment. Tr. 368.

### 2. **Dementia/Memory Problems**

Nurse Johnson's chart notes and Allen Reynolds' testimony also support Reynolds' assertion that he was suffering from MS-related dementia by his DIL. Nurse Johnson noted that Reynolds was experiencing a "sluggish" memory. Tr. 162. No formal testing was done at that time. However, Allen Reynolds testified that, although his brother could still drive and follow the rules of the road, he would take "strange routes to get from one location to the other," missing turns and taking long routes when running errands with his mother. Tr. 363-64. This information, in and of itself, is not particularly illuminating. However, later neuropsychological testing indicates that Reynolds was experiencing MS-related dementia by early 1998, that the progression of his symptoms was relatively slow, but that by the 2005, he was at the "Borderline" or "Extremely Low" range on multiple measures of cognitive functioning.

James E. Bryan, Ph.D., performed a neuropsychological evaluation on Reynolds on September 1, 2004.  Tr. 290-300.  After noting that Reynolds' "only associated neurological condition" is MS, and that his "neurological functioning has shown continued gradual decline for many years," Dr. Bryan diagnosed dementia on the basis of "impairment of adaptive functioning, memory impairment, and other cognitive deficits, particularly involving executive reasoning and planning."  Tr. 299.  He concluded that Reynolds' "condition has progressed mildly, although not significantly" since March 1998 and that Reynolds was "likely at a level of early dementia" as of March 1998.  *Id*.

A year later, Reynolds underwent another neuropsychological evaluation by Katie Ugolini, Ph.D., a licensed psychologist.  Tr. 313-37.  Consistent with Dr. Bryan's findings that Reynolds was experiencing a slow progression of MS symptoms, Dr. Ugolini found a decline in testing performance during the previous year.  Tr. 322.  She concluded found that Reynolds was functioning in the "Borderline" range on tasks involving working memory and in the "Extremely Low" range on tasks involving processing speed.  *Id*.  He also scored in the "Borderline to Extremely Low" range on most tasks of attention/concentration and memory.  *Id*.

The ALJ found Reynolds limited to "routine, repetitive work."  However, even for such jobs, the VE testified that a requirement that a memory impairment which "might require redirection of procedures after a weekend" would be "quite a barrier" to employment at those jobs.  Tr. 498.

**V.  Remand**

After finding that the ALJ erred, this court has discretion whether to remand for an immediate award of benefits or for further proceedings.  *Harman v. Apfel*, 211 F3d 1172, 1178

(9th Cir), *cert denied*, 531 US 1038 (2000).  A remand for an award of benefits is appropriate

when no useful purpose would be served by further administrative proceedings because the

record has been fully developed and the evidence is not sufficient to support the Commissioner's

decision, and it is clear from the record the ALJ would be required to award benefits.  *Holohan v.*

*Massanari*, 246 F3d 1195, 1210 (9th Cir 2001).

     In this case, the record is clear that if the evidence concerning the restrictions imposed by

Reynolds' fatigue were properly credited, Reynolds would be found disabled.  The VE testified

that individuals who suffer from chronic fatigue precluding task completion after noon are not

competitively employable.  In addition, the testimony concerning Reynolds' MS-related dementia

and irritability, including the findings of Drs. Bryan and Ugolini, supports Reynolds' contention

that he was not competitively employable by early 1998.  Allen Reynolds' testimony and Nurse

Johnson's chart notes just before Reynolds' DIL indicate that Reynolds was suffering from

ongoing memory problems and behavioral outbursts related to his difficulties with irritation and

anger.  Both Drs. Bryan and Ugolini found that Reynolds' progressive MS symptoms were

slowly chipping away at his cognitive skills.  Those symptoms were present in early 1998 and

left Reynolds in the Extremely Low or Borderline range in a number of cognitive areas by 2005.

VE testimony indicates that these behavioral and cognitive issues would interfere with

competitive employment.  Tr. 368, 497-98.  Thus, even without considering the other issues

identified by Reynolds' attorney regarding the jobs identified by the VE, such as the reasoning

level and the effect of any residual manipulative limitations, the fully credited testimony by Allen

Reynolds combined with the opinions of Drs. Bryan and Ugolini establish that Reynolds was not

competitively employable as of 1996 or 1997. Accordingly, no additional investigation or explanation of the record is needed.

## **ORDER**

For the reasons stated above, the Commissioner's decision is REVERSED and REMANDED pursuant to Sentence Four of 42 USC § 405(g) for the immediate calculation and award of benefits.

DATED this 3rd day of March, 2011.

s/ Janice M. Stewart_____
Janice M. Stewart
United States Magistrate Judge